

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

Civil Action No. 15 CV 781 KBM/LF

FILED
UNITED STATES DISTRICT COURT
DISTRICT OF NEW MEXICO

15 SEP -3 PM 1:37

CLERK-ALBUQUERQUE

| | |
|---|---|
| THE UNITED STATES OF AMERICA *ex rel.* ANDREW BUSTOS, | **COMPLAINT FOR DAMAGES AND PENALTIES** |
| Plaintiff, | |
| vs. | |
| WALGREENS BOOTS ALLIANCE, INC. and WALGREENS CO., | **(Filed Under Seal pursuant to 31 U.S.C. §3730 (b)(2)** |
| Defendants. | **Jury Trial Demanded** |

Relator Andrew Bustos ("Relator"), pursuant to the provision of the False Claims Act, 31 U.S.C. §3729 et seq., brings this action as a qui tam Plaintiff on behalf of the United States. For his Complaint, Relator states:

1.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1355, and 31 U.S.C. § 3732(a).

2.  Venue is proper in this district under 28 U.S.C. §§ 1391(b) and 1395, and 31 U.S.C. § 3732(a) because some of the acts alleged in this complaint occurred in the District of New Mexico.

3.  Relator/qui tam Plaintiff Andrew Bustos brings this action under the False Claims Act on behalf of and on the relation of the United States of America.

4.  Relator is a citizen of the United States and a resident of the State of New Mexico.

5.  Defendant Walgreen Co. is an Illinois corporation that did business in New Mexico, all fifty states within the United States, the District of Columbia, Puerto Rico, and the US

1

Virgin Islands, engaging in the business of, among other things, selling and dispensing prescription drugs between January 1, 2010, and September 2, 2014.

6.  Defendant Walgreens Boots Alliance, Inc., is a Delaware corporation incorporated in 2014.  Defendant Walgreens Boots Alliance, Inc., is the successor in interest to Defendant Walgreens Co. (Defendant Walgreens Co. and Defendant Walgreens Boots Alliance, Inc., are collectively referred to herein as "Walgreens").

7.  Medicare Part B, 42 U.S.C. 1395j *et seq.*, is a program of the Federal Government that, in part, provides reimbursement to pharmacies on behalf of Medicare Part B eligible patients for filling prescriptions of some medications, medical supplies and durable medical equipment ("DME") including but not limited to diabetic test supplies like blood-testing strips and blood glucose monitors, immunosuppressant drugs, and chemotherapy drugs for individuals who are eligible for Medicare.  42 U.S.C. §§1395k(a)(2)(G), 1395m(a)(13), and 1395x(n). The term "Medicare" as used in this Complaint refers specifically to Medicare Part B.

8.  Walgreens submits claims for reimbursement to Medicare Part B for prescriptions that are filled for Medicare Part B eligible patients as described below.

9.  Walgreens engaged in actions on a nationwide basis which resulted in Walgreens knowingly billing Medicare Part B for prescriptions that were never delivered to patients, but which were paid for by Medicare Part B, thereby resulting in Walgreens obtaining money from the Medicare program it was not entitled to receive, and when advised by the Relator of this practice, failed to advise the Medicare program it had billed Medicare for

prescriptions that had not been delivered to patients and failed to reverse those claims for reimbursement.

10.    The false claims that are described in this Complaint began on January 17, 2008, and ended on March 12, 2013, at the earliest.

11.    In addition, Relator knows that in early 2015, Walgreens discussed implementing policies and practices which, if implemented, would have caused Walgreens to resume submitting claims for reimbursement to Medicare Part B for prescriptions that were not delivered to patients.

12.    Walgreens first began billing Medicare for prescriptions that were never delivered to patients on January 17, 2008.

**WALGREENS PROCESS FOR FILLING PRESCRIPTIONS, DELETING[1] PRESCRIPTIONS, AND SUBMITTING CLAIMS TO THIRD-PARTY PAYORS**

---

[1]    The term "delete," "deleted," or "deletion" in this Complaint refers to the process that Walgreens pharmacists go through to cancel the submission of claims to or reimbursement of claims by third-party payors.  Within the Walgreens system, the terms "delete," "deleted," or "deletion" can refer to at least three different procedures.

The first type of "deletion" erases all billing information and all prescription information from the Intercom PLUS system described in Paragraph 14.

The second type of "deletion" refers to new prescriptions and cancels prescription billing or claims submission to a third party payor, but preserves the prescription information in the patient profile in Intercom PLUS described in Paragraph 14.  This type of deletion should result in no bill or claim for reimbursement being submitted to a third-party payor.

The third type of "deletion" refers to refill requests for recurring prescriptions and cancels current prescription billing or claims submission to a third party payor, but preserves the prescription information including refill eligibility in the patient profile in Intercom PLUS described in Paragraph 14.  This allows a patient who does not pick up a refill to request the refill at a later date.  This type of deletion should result in no bill or claim for reimbursement being submitted to a third-party payor.

The term "delete," "deleted," or "deletion" in this Complaint refers to the second and third types of "deletion" in the preceding two footnote paragraphs.

3

13.   The procedure at all Walgreens pharmacies for filling prescriptions is that when a prescription is given to a pharmacist by a patient or a prescribing medical provider, pharmacy staff enters the prescription into Intercom PLUS.

14.   "Intercom PLUS" is a computerized dispensing, tracking, and claim submission system used by all Walgreens pharmacies on a system-wide basis. Intercom PLUS tracks the dispensing of all prescriptions, displays whether a particular prescription is covered by insurance and the co-payment to be paid by the patient, and transmits claims for prescription reimbursement to the third-party payor, or in the case of claims to Medicare, transmits the claim information to the Walgreens Medicare Help Desk as described below.

15.   Once the prescription information is entered into Intercom PLUS, the prescription is then dispensed, packaged, and placed in a bin to await patient pick up.

16.   At all Walgreens pharmacies across the United States, prescriptions are deleted when a patient declines to accept the prescription or fails to pick up the prescription for a period of time.

17.   Before January 17, 2008, the policy at Walgreens was to hold prescriptions on the shelf for seven (7) days before deleting the prescription from Intercom PLUS.

18.   On January 17, 2008, Walgreens extended the deletion period for prescriptions on the shelf from seven (7) days to ten (10) days.

19.   After January 17, 2008, the policy at Walgreens was to hold prescriptions on the shelf for ten (10) days before deleting the prescription from Intercom PLUS.

20.   The policy of waiting ten (10) days for the patient to pick up the prescription before deleting the prescription in Intercom PLUS was in effect at all Walgreens pharmacies from January 17, 2008, until Relator left his employment at Walgreens in February 2015.

21.   When patients failed to pick up prescriptions within ten (10) days of a prescription being filled, the policy at Walgreens was to return that prescription to inventory and delete the prescription in the Intercom PLUS database.

22.   Every day, Intercom PLUS would automatically generate and print out a Deletion Report at each store which listed the filled prescriptions that had not been picked up for ten (10) days and were due to be deleted.  The Intercom PLUS Deletion Report included Medicare covered prescriptions that had not been picked up for ten (10) days.

23.   Every day, based on the Intercom PLUS Deletion Report, a pharmacist at each store would delete prescriptions from the computerized dispensing system, remove patient identifying information from the prescription container, and return the medication to inventory. The returned medication could then be re-dispensed to fill future prescriptions.

24.   During the time Relator was employed by Walgreens until at least March 12, 2013, Walgreens pharmacists followed this practice for processing and deleting prescriptions paid for by Medicare Part B.  During that time, no notice or instruction was ever issued or given by Walgreens to Walgreens pharmacists to delete Medicare prescriptions in any different way, nor were any instructions or directions given to engage in any different process to reverse charges to Medicare for deleted prescriptions.

25.   The "Walgreens Medicare Help Desk" (the "Walgreens Medicare Help Desk") was a Walgreens entity that was used by Walgreens stores on a system-wide basis as an

intermediate step in the billing process for Medicare Part B prescriptions. Walgreens's system for billing Medicare for pharmacy prescriptions is centralized in the Walgreens Medicare Help Desk. When a prescription that is eligible for Medicare Part B coverage is entered into Intercom PLUS, the prescription information would be automatically transmitted to the Walgreens Medicare Help Desk. The Walgreens Medicare Help Desk then transmitted the claims to Medicare.

26.    During the time Relator was employed by Walgreens until at least March 12, 2013, the Walgreens Medicare Help Desk would hold Medicare claims for seven (7) days after they were first entered into the Intercom PLUS system and then submit the claims for reimbursement to Medicare after the seventh (7) day.

27.    After January 17, 2008, when Medicare prescriptions were deleted on the tenth (10th) day after being entered into Intercom PLUS, the Walgreens Medicare Help Desk had already submitted those claims for reimbursement to Medicare after the seventh (7th) day after each prescription had been entered into Intercom Plus.

28.    Walgreens had no process in place to notify Medicare to stop the payment of a claim for reimbursement if a prescription was deleted after the claim for reimbursement for that prescription had been submitted to Medicare.

29.    Beginning on January 17, 2008, when a Medicare covered prescription was deleted from Intercom PLUS because the patient had not picked up the prescription within ten (10) days after the prescription was first entered into Intercom PLUS, Walgreens did not notify Medicare that the prescription had been deleted and not delivered to the patient and that therefore the claim for reimbursement for the deleted prescription should not be paid.

6

30.     Therefore, from January 17, 2008, until at least March 12, 2013, Medicare was
        reimbursing Walgreens for prescriptions that had not been delivered to patients.

### RELATOR'S WORK HISTORY AT WALGREENS

31.     Relator worked for Walgreens from December 1994 until February 2015.

32.      Relator's first position with Walgreens was as a Pharmacy Technician from December
        1994 to May 1996. In that capacity, he assisted pharmacists in typing, adjudicating
        prescriptions to third party plans, filling prescriptions and other duties as directed by the
        pharmacist.

33.     From May 1996 to December 1998, Relator worked as a Pharmacy Intern.  As a
        Pharmacy Intern, Relator's duties were the same as a Pharmacy Technician.  In addition,
        Relator was allowed to take verbal prescriptions from providers over the phone and
        provide counseling to patients on their medications

34.     Beginning in December of 1998, Relator was employed by Walgreens as a Pharmacy
        Manager at a Walgreens store in Farmington, New Mexico.  As a Pharmacy Manager,
        Relator was responsible for ensuring smooth operations of the pharmacy department.
        Relator managed pharmacy staff including interviewing and training.  Relator supervised
        the pharmacy's inventory management, managed customer service, and ensured
        compliance with laws governing pharmacy practice and drug distribution including laws
        and regulations relating to Medicare Part B.

35.      In approximately January of 2004, Relator was promoted to the position of District
        Pharmacy Supervisor based in Albuquerque, New Mexico.  As District Pharmacy
        Supervisor, Relator directed stores to operate efficiently, comply with company policies,

procedures and programs that maximize potential sales, script growth, margin and profitability. Relator directly supervised pharmacy managers and carried out supervisory responsibilities in accordance with Walgreens policies and applicable laws including laws and regulations relating to Medicare Part B. Relator's responsibilities included interviewing, hiring, staffing, training, evaluating, rewarding, and disciplining subordinates, customer service, inventory, ensuring the profitability of the pharmacies under his supervision, and resolving complaints. In his capacity as District Pharmacy Supervisor, he managed between 24 and 30 pharmacies in New Mexico including pharmacies in Taos, Las Vegas, Espanola, Santa Fe, Rio Rancho, the Westside of Albuquerque, Los Lunas, and Belen.

36.   Relator held this position for 11 years before leaving the employment of Walgreens in February of 2015.

### RELATOR'S KNOWLEDGE OF FALSE CLAIMS

37.   Approximately two years ago, Relator learned of problems with the deletion of prescriptions paid for by Medicare. On or about January 18, 2013, during a supervision visit at Store # 5157 in Espanola, New Mexico, the Pharmacy Manager, Antonia Weinstein, asked Relator if the pharmacy had to call prescription deletions in to the Walgreens Medicare Help Desk.

38.   Ms. Weinstein explained to the Relator that a patient had come to get their Medicare prescription refilled, but the prescription had been rejected by Medicare on the grounds it was too soon for the patient to receive a refill of the prescription.

8

39.  The same prescription had been filled for the patient the previous month but had been deleted after ten (10) days from Intercom PLUS because the patient never picked it up.

40.  While the patient had never picked up the prescription and it was deleted from Intercom PLUS after ten (10) days, the claim for reimbursement had been submitted to Medicare after the seventh (7th) day. Therefore, from the Walgreens Medicare Help Desk's perspective, the patient was trying to fill a "refill" prescription that had already been apparently dispensed to the patient the month before.  The Walgreens Medicare Help Desk refused to authorize the "refill" on the basis that the particular prescription was not eligible for a "refill" until a later date, unaware that the patient had not actually received the prescription.

41.  At the time of the above conversation with Ms. Weinstein, Relator understood that pharmacies did not have to call the Walgreens Medicare Help Desk when deleting Medicare prescriptions, and that the same process of deleting prescriptions paid for by private payor insurance companies was used to delete prescriptions paid for by Medicare.

42.  Before January 18, 2013, the Relator had never been instructed by anyone within Walgreens that it was necessary for a pharmacist to call the Walgreens Medicare Help Desk in order to reverse charges to Medicare for deleted prescriptions. Relator, therefore, told Antonia Weinstein that she did not need to call the Walgreens Medicare Help Desk to delete Medicare prescriptions.

43.  At the Relator's direction, JC Lovelace, a pharmacy extern who had accompanied Relator on the above-described visit, called the Walgreens Medicare Help Desk.

9

44. Mr. Lovelace was told by the Walgreens Medicare Help Desk that the claim for the prescription from the previous month had not been reversed. Mr. Lovelace was also told that stores were required to call the Walgreens Medicare Help Desk to reverse the submission of claims to Medicare on every deleted prescription, that deleting a prescription in Intercom PLUS did not result in a reversal of charges to Medicare, that none of the Walgreens stores knew about this requirement, and that the Walgreens Medicare Help Desk received many calls about this issue.

45. The person at the Walgreens Medicare Help Desk explained that the reason pharmacists needed to call the Walgreens Medicare Help Desk to reverse charges to Medicare for prescriptions that had been deleted was because the Walgreens Medicare Help Desk holds Medicare claims for seven (7) days after they are first entered into the Intercom PLUS system by a pharmacist, and then submits the claims for payment to Medicare after that seven (7) day period.

46. Until that point, Relator had always understood and had been trained by Walgreens that if a prescription had not been picked up and was on the ten (10) day Intercom PLUS Deletion Report, the charge for that prescription was automatically reversed when that prescription was deleted in Intercom PLUS.

47. Until that point, Relator had also always understood that Walgreens never received reimbursement until at least two weeks after the prescription was billed so the process of deleting prescriptions from Intercom PLUS after ten (10) days prevented prescriptions from being reimbursed if they were not picked up.

10

48. Before the Extern called the Walgreens Medicare Help Desk on January 18, 2013, Relator had never been instructed or told that the process for deleting Medicare prescriptions and cancelling claims for reimbursement was different in any way from the process for deleting prescriptions paid for by other payors.

49. After learning that Walgreens had been and was submitting claims to Medicare for prescriptions that were not picked up by patients, Relator called Ric Leonardi, Director of Medicare Part B at Walgreens. Mr. Leonardi was the contact for any issues regarding Medicare Part B.

50. Mr. Leonardi claimed that Walgreens's policy and practice had always required pharmacies to call the Walgreens Medicare Help Desk for Medicare deletions.

51. Relator told Mr. Leonardi that he had never heard of such a policy, and that there was no reference to such a policy in the Walgreens Policies and Procedures. Relator asked Mr. Leonardi to send out an updated policy so Walgreens pharmacies would be informed of the proper procedure for deleting prescriptions paid for by Medicare. Mr. Leonardi said he would work with Walgreens Operations/Administration to have a "Compass Task" issued.

52. Walgreens uses a communication tool known as Compass. All stores were required to check Compass at least once a day for task lists, or policy changes that were to be implemented. To Relator's knowledge, no "Compass Task" regarding this issue was ever sent out by Walgreens.

53. After speaking with Mr. Leonardi, Relator called Karen Padilla (Albuquerque Pharmacy Manager) and Brian Wilson (District Pharmacy Supervisor in Colorado District), as well

as other Walgreens pharmacy managers and district supervisors about the deletion of Medicare prescriptions and Walgreens's policy. All of the Pharmacy Managers and District Pharmacy Supervisors who the Relator spoke with informed him that no one they knew of was calling the Walgreens Medicare Help Desk when Medicare prescriptions were deleted, and confirmed that there were no written policies stating that a pharmacist must call Walgreens Medicare Help Desk for Medicare prescription deletions.

54. On or about January 21, 2013, Relator called Laura Zimmerly, Walgreens's Market Pharmacy Director, and made her aware of his concerns and the fact that Walgreens was submitting claims to Medicare for prescriptions that were not picked up by patients. Ms. Zimmerly agreed that this was a major concern, and agreed with the Relator that Medicare claims were not being reversed, and that Walgreens pharmacies were "not in compliance." This meant that Medicare was paying Walgreens for prescriptions that had been deleted and never provided to patients.

55. Ms. Zimmerly asked the Relator to follow up with Mr. Leonardi on an updated policy.

56. On February 4 and 11, 2013, Relator called Mr. Leonardi asking about the status of the new policy on deleting Medicare prescriptions. Relator received no response from Mr. Leonardi to those phone calls.

57. During the week of February 11, 2013, a risk management survey was sent to all District Managers and District Pharmacy Supervisors, including Relator. In his response to the risk management survey, Relator reported non-compliance with the Medicare Part B program due to Walgreens billing Medicare for prescriptions that were never delivered to patients.

58.   On February 12, 2013, Relator called Howard Atlas, the Market Vice President of
      Walgreens, to explain his concerns about Walgreens submitting claims for
      reimbursement to Medicare for prescriptions that were subsequently deleted.  Mr. Atlas
      stated that this was something that needed to be researched and corrected if necessary.

59.   On February 12, 2013, within an hour of the phone conversation between Relator and
      Howard Atlas, Relator received an e-mail from Mr. Leonardi acknowledging that
      Walgreens did not have a deletions policy for Medicare Part B and that Walgreens was
      working on drafting one. Mr. Leonardi also indicated that Jim Ash, who was the Manager
      of Medicare Operations at Walgreens and Mr. Leonardi's subordinate, would contact
      Relator.

60.   On February 13, 2013, the Relator received an e-mail from Mr. Ash asking for Relator to
      again describe his specific concerns.

61.   After receiving the February 13, 2013 email from Mr. Ash, Relator e-mailed Ms.
      Zimmerly and Mr. Atlas, expressing his frustration that the nature of his concern should
      be rather obvious.  Relator then called Ms. Zimmerly who asked the Relator to call Mr.
      Ash so Walgreens's Medicare Part B management team could get a store perspective on
      the problem and that way a solution could be implemented.

62.   After speaking with Ms. Zimmerly on February 13, 2013, Relator called Mr. Ash on the
      same day.  Based on the phone conversation that the Relator had with Mr. Ash, Relator
      learned that the Walgreens Medicare Help Desk was not aware of the change to the
      deletion period policy that took place on January 17, 2008. As a result, the Walgreens
      Medicare Help Desk continued to bill Medicare for prescriptions after waiting only seven

13

(7) days after the prescription was first entered into Intercom PLUS, even though prescriptions were not deleted by the pharmacy until ten (10) days after the prescription was first entered into Intercom PLUS.

63.   During that phone call between Relator and Mr. Ash, Mr. Ash said that he understood Relator's concern and confirmed that Walgreens had been submitting claims for reimbursement to Medicare for prescriptions that were not delivered to patients because the Walgreens Medicare Help Desk submitted claims the Medicare Part B claims were submitted automatically after the seventh (7th) day and that if the prescription was deleted from Intercom PLUS on the tenth (10th) day then the claim was never reversed. Mr. Ash agreed with Relator that this was a "big problem".

64.   During the phone call between Relator and Mr. Ash on February 13, 2013, Mr. Ash proposed that the solution to the problem raised by Relator was to change the Medicare billing date from after the seventh (7th) day to the eleventh (11th) day after prescriptions are entered into Intercom PLUS. This change was intended to prevent any prescriptions that are deleted on the tenth day from being billed to Medicare, making the deletion a non-issue. Relator sent Mr. Atlas a text to inform him of the solution and Mr. Atlas indicated that he had also spoken to Mr. Ash and was aware of the solution.

65.   On March 12, 2013, Relator received an email from Mr. Ash stating that the date on which claims for reimbursement were submitted to Medicare Part B had been moved from after the seventh (7th) day to the eleventh (11th) day after prescriptions are entered into Intercom PLUS.

66.   Relator is without personal knowledge about whether the date on which claims for reimbursement to Medicare was actually moved from after the seventh (7th) day to the eleventh (11th) day.

67.   To Relator's knowledge, Walgreens took no action to repay Medicare for the claims that Walgreens had submitted and received payment for from Medicare during the five-year period between January 17, 2008, and March 12, 2013, for prescriptions that were deleted and not delivered to patients after the claim was submitted to Medicare.

68.   The period of time in which Walgreens billed and received payment from the Medicare program for prescriptions that were never delivered to the patient ran from approximately January 17, 2008, when Walgreens extended the period of time filled prescriptions were kept on the shelf to allow patient pick up from seven (7) days to ten (10) days, until at least March 12, 2013, when Walgreens claims to have changed the date on which claims for reimbursement were submitted to Medicare from after seven (7) days to eleven (11) days.

69.   At regional meetings in late 2014 and early 2015, Walgreens discussed moving the prescription deletion day for all prescriptions to the fourteenth (14th) day after a prescription is entered. If this change was made, it would create the same problem that existed before Walgreens extended the Medicare billing date from seven to eleven days. Even assuming that on March 12, 2013, Walgreens started submitting claims to Medicare on the eleventh (11th) day, under the proposed change in the deletion day, prescriptions would not be deleted until the fourteenth (14th) day after the prescription is entered, three (3) days after the claim for reimbursement was submitted to Medicare.

15

70.  The Relator left his employment at Walgreens in late February of 2015.

71.  No public disclosure of the information contained in this Complaint has occurred.

72.  Relator/qui tam Plaintiff is an original source of the information set forth in this Complaint and has direct and independent knowledge of the allegations and transactions giving rise to the allegations in this Complaint and the Defendants' presentment of false claims to the United States for payment and approval.

### COUNT I: VIOLATION OF FEDERAL FALSE CLAIMS ACT; 31 U.S.C. § 3729(a)(1)(A)

73.  Relator incorporates by reference all preceding allegations as if fully set forth herein.

74.  Between January 17, 2008, and the present, Defendants "knowingly," within the meaning of the False Claims Act, submitted claims seeking payment for prescriptions that were not delivered to patients which are identified in the preceding paragraphs of this Complaint.

75.  Those claims seeking payment for prescriptions that were not delivered to patients were false, within the meaning of the False Claims Act, and the Defendants were not entitled to be reimbursed for the prescriptions they billed Medicare Part B which had not been delivered to patients.

76.  Despite knowing of the falsity of those claims, the Defendants submitted these claims to Medicare Part B and received reimbursement from Medicare Part B for those claims.

77.  The United States, upon presentation of each such claim for payment, whether directly or indirectly, remitted payment despite the falsity of those claims and the ineligibility of Defendants to receive payment for those claims, and therefore suffered damage.

78.   The above-described presentment of false claims for payment constitute violations of 31 U.S.C. §3729(a)(1)(A) and directly and proximately caused the United States government to suffer damages in an amount to be determined.

79.   Pursuant to 31 U.S.C. §3729(a), the Defendants are liable for three times the amount of all sums paid to the Defendants by the United States as a result of the false claims and certifications submitted to the United States by the Defendants, mandatory civil penalties of no less than $5,500 and no more than $11,000 for each false claim and certification submitted to the United States, and pre and post judgment interest which attaches to such amounts.

80.   Relator/qui tam Plaintiff, who has brought this action on behalf of the United States and himself pursuant to 31 U.S.C. §3730(b), is entitled under 31 U.S.C. §3730(d) to an award of not less than fifteen and not more than thirty percent of the amounts recovered as a result of bringing this action, an award of reasonable attorney's fees and costs incurred in bringing this action, and to reasonable expenses which this Court finds to have been necessarily incurred.

### COUNT II: VIOLATION OF FEDERAL FALSE CLAIMS ACT; 31 U.S.C. § 3729(a)(1)(B)

81.   Relator incorporates by reference all preceding allegations as if fully set forth herein.

82.   At all relevant times, Defendants "knowingly," within the meaning of the False Claims Act, made, used, or caused to be made or used, false records or statements material to its false or fraudulent claims when they submitted claims for reimbursement of prescriptions that were not delivered to patients.

17

83. The United States, upon presentation of each such false record or statement material to the false or fraudulent claims for reimbursement for prescriptions that had not been delivered to patients, remitted payment despite the falsity of those records or statements, and therefore suffered damage.

84. The above-described creation or use of false records or statements material to the false claims for payment constitute violations of 31 U.S.C. §3729(a)(1)(B) and directly and proximately caused the United States government to suffer damages in an amount to be determined.

85. Pursuant to 31 U.S.C. §3729(a), the Defendants are liable for three times the amount of all sums paid to the Defendants by the United States as a result of the false claims and certifications submitted to the United States by the Defendants, mandatory civil penalties of no less than $5,500 and no more than $11,000 for each false claim and certification submitted to the United States, and pre and post judgment interest which attaches to such amounts.

86. Relator/qui tam Plaintiff, who has brought this action on behalf of the United States and himself pursuant to 31 U.S.C. §3730(b), is entitled under 31 U.S.C. §3730(d) to an award of not less than fifteen and not more than thirty percent of the amounts recovered as a result of bringing this action, an award of reasonable attorney's fees and costs incurred in bringing this action, and to reasonable expenses which this Court finds to have been necessarily incurred.

**COUNT III: VIOLATION OF FEDERAL FALSE CLAIMS ACT;
31 U.S.C. § 3729(a)(1)(G)**

87. Relator incorporates by reference all preceding allegations as if fully set forth herein.

18

88.     After Relator informed Defendants that they had received reimbursement from Medicare Part B for those claims, Defendants "knowingly," within the meaning of the False Claims Act, concealed or knowingly and improperly avoided or decreased their obligation to pay back the wrongful reimbursement to Medicare Part B.

89.     The above-described concealment or knowing and improper avoidance or decrease of Defendants' obligation to repay the wrongful reimbursements from Medicare Part B constitutes violations of 31 U.S.C. §3729(a)(1)(G) and directly and proximately caused the United States government to suffer damages in an amount to be determined.

90.     Pursuant to 31 U.S.C. §3729(a), the Defendants are liable for three times the amount of all sums paid to the Defendants by the United States as a result of the false claims and certifications submitted to the United States by the Defendants, mandatory civil penalties of no less than $5,500 and no more than $11,000 for each false claim and certification submitted to the United States, and pre and post judgment interest which attaches to such amounts.

91.     Relator/qui tam Plaintiff, who has brought this action on behalf of the United States and himself pursuant to 31 U.S.C. §3730(b), is entitled under 31 U.S.C. §3730(d) to an award of not less than fifteen and not more than thirty percent of the amounts recovered as a result of bringing this action, an award of reasonable attorney's fees and costs incurred in bringing this action, and to reasonable expenses which this Court finds to have been necessarily incurred.

WHEREFORE, Relator/qui tam Plaintiff prays that judgment be entered in Plaintiff and

Relator/qui tam Plaintiff's favor and against Defendant, awarding the Plaintiff United States

three times the amount of all sums paid by the United States of America as a result of the

Defendants' violations of the False Claims Act, mandatory statutory penalties of not less than

$11,000 for each false claim submitted by the Defendants, pre and post judgment interest,

awarding the Relator/qui tam Plaintiff on his own behalf twenty five percent of all amounts

recovered under the claims as to which the United States has intervened and thirty percent of all

amounts recovered under the claims as to which the United States has not intervened, reasonable

attorneys' fees and costs, an award of reasonable expenses which the Court finds to have been

necessarily incurred by the Relator/qui tam Plaintiff in bringing this action and awarding any

other and further relief as the Court deems just and proper.

Respectfully submitted,

SANDERS & WESTBROOK, PC

 /s/ Duff Westbrook
Duff Westbrook
Maureen A. Sanders
Brian L. Moore
102 Granite Ave. NW
Albuquerque, NM 87102
(505) 243-2243


 /s/ Daniel M. Faber
Daniel M. Faber
4620C Jefferson Lane NE
Albuquerque, NM 87109
(505) 830-0405